# APPENDIX

# INDEX TO APPENDIX

**Document** **Page Number**


Notice of Voluntary Dismissal
dated August 22, 2007 . . . . . . . . . . 1

Motion for Relief from Order and Supporting Declarations
dated July 29, 2008 . . . . . . . . . . 3

Affidavit of Laverne Williams (U.S. District Court)
dated November 13, 2007 . . . . . . . . . . 12

Affidavit of Laverne Williams (Court of Federal Claims)
dated November 9, 2007 . . . . . . . . . . 24

Complaint (Court of Federal Claims)
dated February 22, 2006 . . . . . . . . . . 28

First Amended Complaint (District Court)
dated March 22, 2005 . . . . . . . . . . 43

Affidavit of Robert Williams (U.S. District Court)
dated November 13, 2007 . . . . . . . . . . 61

# THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ROBERT WILLIAMS and LAVERNE WILLIAMS, | |
| Plaintiffs, | No. 06-124C (Judge Williams) |
| v. | |
| THE UNITED STATES, | |
| Defendant. | |

## PLAINTIFFS' NOTICE OF VOULUTARY DISMISSAL

Pursuant the Court's order dated April 6, 2007, Plaintiffs, after much legal research, trepidation and review of (1) to 28 U.S.C. § 1500, (2) applicable case law and (3) Defendant's Supplemental Brief in Support of Motion to Dismiss, notice the Court, hereby, of their decision to file this PLAINTIFFS' NOTICE OF VOULUTARY DISMISSAL and would show upon the honorable Court the following:

The statutory and applicable case law prohibit this Court from entertaining the action pending before the Court.

Plaintiffs, by and through Counsel, notice the Court that they wish this case be dismissed with prejudice. Counsel has advised Plaintiffs of the statutory and applicable case law prohibiting this action. Plaintiffs have approved the filing of this pleading.

Respectfully submitted,

Law Office of
James W. Myart, Jr. P.C.
306 Preston Avenue
San Antonio, Texas 78210
Phone: (210) 533-9461
Fax: (210) 533-4815

By _/s/____________________

James W. Myart, Jr.

**CERTIFCATE OF FILING**

A copy of the foregoing has been served this 22[ND] day of August, 2007 on Mr. Kirk Manhardt, Counsel for Defendant via ECF and FAX .

/s/____________________
James W. Myart, Jr.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ROBERT WILLIAMS and<br>LAVERNE WILLIAMS,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 06-124C<br>(Mary Ellen Coster Williams) |

**MOTION FOR RELIEF FROM ORDER**

Come now the plaintiffs, Robert and Laverne Williams, by and through their undersigned counsel, and move this Honorable Court, pursuant to Rule 60(b) of the Rules of the Unites States Court of Federal Claims, to grant unto them relief from its Order of Dismissal. In support of this motion, the plaintiffs would show unto the Court as follows:

1. The plaintiffs' former attorney, James W. Myart, Jr., of San Antonio, Texas, filed the above-styled action on February 22, 2006.

2. On August 22, 2007, Mr. Myart filed a Notice of Voluntary Dismissal on behalf of Laverne Williams, requesting a dismissal *with prejudice*. In this Notice Mr. Myart avers to the Court that he "has advised Plaintiffs of the statutory and applicable case law prohibiting this action. Plaintiffs have approved the filing of this pleading." (Docket Entry 25)

3. On August 23, 2007, this Court ordered that the above-styled case be dismissed with prejudice pursuant to the Notice of Voluntary Dismissal. (Docket Entry 26)

4. On February 4, 2008, the Clerk of the Court entered a Judgment dismissing the plaintiffs' complaint with prejudice. (Docket Entry 27)

5. Mr. Myart was not authorized by the plaintiffs to file a Notice of Voluntary Dismissal on their behalf. (See attached declarations of Robert Williams, Laverne Williams, and Gwen Boyd)

6. In fact, the plaintiffs had no knowledge of Mr. Myart's intention to file a Notice of Voluntary Dismissal, or his actual filing of said notice.

7. The plaintiffs have never desired that their case be dismissed, and certainly have not desired that it be dismissed with prejudice.

8. The plaintiffs were unaware that a Notice of Voluntary Dismissal had been filed in the above-styled action, and moreover were unaware that the Court had actually dismissed their case with prejudice until June 2008, when they were instructed of this circumstance by their undersigned counsel.

9. Mr. Myart has committed a fraud upon this Court by intentionally misrepresenting that he had the authority to dismiss the plaintiffs' complaint, and that the plaintiffs were informed of and consented to such a dismissal.

10. As a result of Mr. Myart's fraudulent actions, the plaintiffs have been deprived of their Constitutional Right to Due Process of Law, and have been denied their ability to seek redress for the harm alleged in their complaint.

11. The plaintiffs assert that the circumstances of this case present a claim of mistake, inadvertence, surprise, or excusable neglect sufficient to justify relief from the operation of the Court's Order and Judgment of Dismissal, pursuant to Rule 60(b)(1) of the *Rules of the United States Court of Federal Claims*.

12. Further, the plaintiffs assert that the circumstances of this case present a compelling case justifying relief from the operation of the Court's Order and Judgment of

Dismissal, pursuant to the general provision of Rule 60(b)(6) of the *Rules of the United States Court of Federal Claims*.

WHEREFORE, the premises considered, the plaintiffs move this Honorable Court to grant their prayer for relief from the Court's Judgment, and reinstate the above-styled action.

Respectfully submitted on this the 29th day of July, 2008.

**/s/ Howell Roger Riggs**
Howell Roger Riggs
Attorney for the Plaintiff
Dick Riggs Miller LLP
200 Clinton Avenue West, Suite 1050
Huntsville, Alabama 35801
Tel: (256) 564-7317
Fax: (256) 564-7319
hriggs@drmslaw.net

**Certificate of Service**

I, Howell Roger Riggs, do hereby certify that as of the 29th day of July, 2008, a true and correct copy of the foregoing Motion has been lawfully served upon counsel for the defendant incident to the electronic filing hereof, and by U.S. Mail, postage pre-paid and properly addressed to the following:

Doris Susan Finnerman
U.S. Department of Justice, Civil Division
1100 L. Street, N.W.
Classification Unit, 8th Floor
Washington, DC 20530

Kirk Thomas Manhardt
U.S. Department of Justice, Civil Division
1100 L. Street, N.W.
Classification Unit, 8th Floor
Washington, DC 20530

**/s/ Howell Roger Riggs**
Howell Roger Riggs

Case 1:06-cv-00124-MCW Document 28-2 Filed 07/29/2008 Page 1 of 2

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **ROBERT WILLIAMS and LAVERNE WILLIAMS** | ) | |
| **Plaintiffs,** | ) | **Case No. 06-124C** |
| **v.** | ) | |
| **UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**DECLARATION OF ROBERT WILLIAMS**

I, Robert Williams, make the following declaration in accordance with 28 U.S.C. Section 1746. I am aware that this declaration may be filed in the matter pending before the United States Court of Federal Claims, and that this declaration is the legal equivalent of a statement under oath.

My name is Robert Williams. I am a Resident of Nolan County, Texas, and I have previously attained the age of nineteen (19) years. I have personal knowledge of each fact sworn to herein and I am competent to testify as to the veracity thereof.

I am a plaintiff in the above-styled action. The above styled-action was originally filed by my Attorney James W. Myart, Jr. of San Antonio Texas, on February 22, 2006.

I have never had any discussion with attorney James W. Myart, Jr. concerning the dismissal of the above-styled action from the United States Court of Federal Claims. My attorney, James W. Myart, Jr., never asked for my opinion or permission to dismiss the above-styled action against the United States. I did not authorize Mr. James W. Myart to file a Notice of Voluntary Dismissal in the United States Court of Federal Claims. I had no knowledge that an Order of Dismissal had been issued by The United States Court of Federal Claims in my case against the United States until I was informed of said circumstance in late June 2008 by my new counsel, Howell Roger Riggs, of Huntsville, Alabama.

I believe that the claims originally asserted against the United States in the above-styled action are meritorious, and I wish to pursue recovery thereon.

Executed under penalty of perjury, this the 23rd day of 7/23/08, 2008.

[signature]
ROBERT WILLIAMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **ROBERT WILLIAMS and LAVERNE WILLIAMS** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 06-124C** |
| **v.** | ) | |
| | ) | |
| **UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DECLARATION OF LAVERNE WILLIAMS**

I, Laverne Williams, make the following declaration in accordance with 28 U.S.C. Section 1746. I am aware that this declaration may be filed in the matter pending before the United States Court of Federal Claims, and that this declaration is the legal equivalent of a statement under oath.

My name is Laverne Williams. I am a Resident of Nolan County, Texas, and I have previously attained the age of nineteen (19) years. I have personal knowledge of each fact sworn to herein and I am competent to testify as to the veracity thereof.

I am a plaintiff in the above-styled action, along with my husband Robert Williams. The above-styled action was originally filed by my attorney James W. Myart, Jr. of San Antonio Texas, on February 22, 2006.

I have never had any discussion with attorney James W. Myart, Jr. concerning the dismissal of the above-styled action from the United States Court of Federal Claims. My attorney, James W. Myart, Jr., never asked for my opinion or permission to dismiss the above-styled action against the United States. I did not authorize Mr. James W. Myart to file a Notice of Voluntary Dismissal in the United States Court of Federal Claims. I had no knowledge that an Order of Dismissal had been issued by The United States Court of Federal Claims in my case against the United States until I was informed of said circumstance in late June 2008 by my new counsel, Howell Roger Riggs, of Huntsville, Alabama.

I believe that the claims originally asserted against the United States in the above-styled action are meritorious, and I wish to pursue recovery thereon.

Executed under penalty of perjury, this the 23rd day of July, 2008.

La-Verne Williams

LAVERNE WILLIAMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **ROBERT WILLIAMS and LAVERNE WILLIAMS** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 06-124C** |
| **v.** | ) | |
| | ) | |
| **UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DECLARATION OF GWEN BOYD**

I, Gwen Boyd, make the following declaration in accordance with 28 U.S.C. Section 1746. I am aware that this declaration may be filed in the matter pending before the United States Court of Federal Claims, and that this declaration is the legal equivalent of a statement under oath.

My name is Gwen Boyd. I am a Resident of Nolan County, Texas, and I have previously attained the age of nineteen (19) years. I have personal knowledge of each fact sworn to herein and I am competent to testify as to the veracity thereof.

I am the daughter of Robert Williams and Laverne Williams, plaintiffs in the above-styled action. The above styled-action was originally filed by attorney James W. Myart, Jr. of San Antonio, Texas, on February 22, 2006.

I was authorized by both my parents, Robert Williams and Laverne Williams, plaintiffs in the above-styled action, to discuss their case with their attorney, James W. Myart, Jr.

I have never had any discussion with attorney James W. Myart, Jr. concerning the dismissal of the above-styled action from the United States Court of Federal Claims. Mr. James W. Myart, Jr., never asked for my opinion or permission to dismiss the above-styled action against the United States. I did not authorize Mr. James W. Myart, on behalf of my parents, to file a Notice of Voluntary Dismissal in the United States Court of Federal Claims. I had no knowledge that an Order of Dismissal had been issued by The United States Court of Federal Claims on my parent's case, against the United States until my parents were informed of said circumstance in late June 2008 by their new counsel, Howell Roger Riggs, of Huntsville, Alabama.

Executed under penalty of perjury, this the 23rd day of July, 2008.

Gwen Boyd
GWEN BOYD

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| WILLIAMS, et al., Plaintiffs. | § | |
| v. | § | Civ. No. 03-2245 (CKK) (JMF) |
| JOHANNS, et al., Defendants. | § | |

**AFFIDAVIT OF LAVERNE WILLIAMS IN SUPPORT OF OBJECTIONS TO MAGESTRATE RECOMMENDATIONS AND ORDERS AND MOTION TO RECUSE**

Before me was LAVERNE WILLIAMS who was deposed and said the following:

"My name is LAVERNE WILLIAMS, I am over 18 years old and I am capable of making this affidavit. I have personal knowledge of the facts stated herein and they are stated to the best of my recollection and ability. I make this affidavit under the penalty and understanding of perjury.

My Husband, Robert Williams, and I are the Plaintiffs in this case. The original complaint filed in this case on November 3, 2004 named Mr. James W. Myart, Jr., our attorney, as a Plaintiff as well. Mr. Myart's claims were for interference with contract by the USDA by and through Defendants Frederick Isler and Mr. Clyde Thompson. Mr. Myart dismussed with me and Robert that he thought it better that he waives his claims against the government and Mr. Thompson and Isler because our claim was the priority. Robert and I agreed. Mr. Myart then filed an Amended Complaint on March 22, 2005.

I am writing this affidavit to for five reasons:

1. I am deeply concerned that the real issue of the USDA'S discrimination against us in this case and the prior cases has been lost in all this procedure and because of my illness. All we have ever wanted was justice.

2. I feel that our attorney has been falsely accused of bad conduct because he has been so consistent in his criticism of the USDA'S discrimination against us and

hundreds of other black farmers who have suffered the same discrimination and the Department of Justice attorneys, especially Mr. Michael Sitcov.

3. I sincerely believe that the Court needs a more detailed history and explanation of what has happened to us since our involvement with the USDA which started in 1990. All of this is relevant to our present case.

4. Robert and I believe that Judge Facciola's rulings have unfairly hurt our case tremendously and that his rulings are biased against us because of his bias against our attorney.

5. I want to assure the Court that Robert and I agree with and wholeheartedly support Mr. Myart's objections to Magistrate Judge Facciola's recommendations and orders regarding the discovery process and our Motion to Recuse Judge Facciola. Mr. Myart discussed in detail with Robert and me why he was filing both documents in Court and we gave him our permission to file both documents.

I have read all of Judge Facciola's rulings in this case and I have read the ruling by Judge Kotelly on Mr. Myart's second motion regarding his illness. The Court sent us these documents by mail. Mr. Myart also discussed these documents with me and Robert.

Mr. Myart has explained to Robert and me why he feels it necessary to file a motion to recuse the Judge Facciola and to object to his recommendations.

Robert and I have a long, hurtful and financially damaging relationship with the USDA and we have been subject to and are still being subjected to their discrimination and retaliation for our insistence on going to Court and filing discrimination claims against them.

The history of our USDA relationship is important because our present law suit is not a single act of discrimination isolated from every other act against us by the USDA that has gone on since 1990.

In 1990, the Nolan County FSA supervisor, Alton Pyburn, came to us to ask us if we wanted a farm and he told us that the government was looking for socially disadvantaged framers to put into farming. Robert had been a farmer all his life and it was his and our dream to get a farm. We filled out all the paperwork and got a farm purchase and an operating loan. We later found that we paid more for the farm than it was worth because it was full of rocks and that the operating loan was not enough money to produce cotton. We also found out that Mr. Pyburn and Mr. Dean Alexander, the owner of the farm we purchased, were friends. I believe this transaction became the subject of a federal investigation and Mr. Pyburn retired. I do not know what the outcome of the investigation was or if it was ever completed.

In 1992, Mr. Dennis Crumbie became the FSA County Supervisor. He treated me and Robert very badly from the time we first went in to get an operating loan for 1991 and

1992. We could see that we were in deep financial trouble and that Mr. Cumbie was not interested in helping us as is required by the rules of the USDA. We were unable to get technical support and our loans were either delayed past the planting season or denied all together. We knew that white farmers were being given loans and were being treated better and different than we were being treated. Robert was accused of not providing the USDA information or providing incorrect information. Mr. Myart, without pay, filed an appeal of the denial with the USDA National Appeals Board on this issue. We attended a hearing in Arlington, Texas. Mr. Myart was very ill during that hearing, but he continued the hearing, and won that appeal.

The USDA officials knew that Robert could not read or write. Robert and I thought the USDA officials were simply discriminating against us because of our race, African-American, and color, black and that they were taking advantage of Robert and me as socially disadvantaged farmers.

During this entire period, Robert and I were being harassed by someone in the Nolan County area. There was a sign put on our farm entrance gate that said "Niggers, Go Home." Our gate locks were glued and Robert was shot at while on his tractor.

Robert and I got in contact with Mr. James Myart in San Antonio, Texas. We did so because Mr. Myart had been working on a civil rights case in Abilene, Texas representing a white couple trying to adopt a black baby. He won the case and was on TV all over the country. We wanted an attorney that was not afraid to go up against powerful government officials and Department of Justice lawyers. We knew we had a good discrimination case.

Mr. Myart agreed to come to Roscoe, Texas to meet with us. He went to the farm and talked to us at least six to eight hours. He called us a few days later and told us that he had done some research on the USDA and its Office of Civil Rights. He said that the USDA had essentially closed down its Office of Civil Rights during the Reagan Administration. He said it was obvious that we were not the only black farmers across the country who had suffered outright discrimination in violation of the Equal Credit Opportunity Act of 1972. He said that he was aware that there were three other black farmers, Mr. Walter Powell of Louisiana, Mr. and Mrs. Jim Bowie of Louisiana and Mr. and Mrs. Welchel Long of Georgia, were in the exact same position as us.

Mr. Myart also informed us that he was going to file for us a more formal complaint of discrimination with the USDA Office of Civil Rights but that he was not confident that the USDA would even investigate the complaint let alone do anything to help us and to stop the discrimination.

Myart said he was going to take our case and that he would do his best to get the case resolved in the administrative USDA process before filing a lawsuit. He was not successful in getting the USDA to abide by their first settlement agreement and to settle the case administratively.

Then, Mr. Myart called us and told us that the Office of Civil Rights had found that we had been discriminated against in violation of the Equal Credit Opportunity Act. He further said that although we had a finding of discrimination, the USDA and the USDA Attorneys had adopted the position that it did not discriminate and that even if it did it was protected by sovereign immunity.

In the mean time, Mr. Myart informed us that the USDA agreed to send several USDA officials to meet with us in San Antonio, Texas to negotiate settlement of our case. The people who came to San Antonio from Washington USDA office were Mr. James Radintz, a witness already deposed in this case, and Mr. Carlton Lewis. They settled our administrative claim for $1,600,000 and they apologized to us fro what we had gone through and congratulated us on the settlement. We signed the settlement documents and they told us that they had to present the settlement to their bosses in Washington for signature. We heard nothing else from them for about three (3) months.

Mr. Myart called us and told us that the government had reneged on the settlement claiming that the USDA Officials who had settled the case with us did not have the authority to do so. Robert and I were crushed. We could not believe that government officials would do such a thing and that they could be so mean-spirited. It was just plain wrong.

Mr. Myart then informed us that a lawsuit would have to be filed in district court in Washington, D.C. but also he was going to ask then Secretary Mike Espy to seek a legal opinion from the Justice Department, Office of General Counsel as to whether the ECOA applied to the USDA. I have seen and read that decision which I believe is called the Dellinger Report.

Mr. Myart filed our lawsuit. It was entitled, ***Williams et al v. Glickman*** 1:94-cv-01149-(TAF). It originally named Mike Espy but was changed to Dan Glickman after Mr. Espy resigned from office. That lawsuit complaint is in the records of the Court and it is incorporated here by reference as if fully stated verbatim. The facts are outlined in detail in the original complaint.

Mr. Myart also filed similar law suits for Mr. Walter Powell of Louisiana, Mr. and Mrs. Jim Bowie of Louisiana and Mr. and Mrs. Welchel Long of Georgia.

Mr. Myart later filed a class action lawsuit entitled ***WILLIAMS, et al v. GLICKMAN***, et al, 1:94-cv-00523-(TAF). This lawsuit complaint is in the records of the Court and it is incorporated here by reference as if fully stated verbatim. The facts are outlined in detail in the original complaint. The class was not certified by Judge Flannery and the case was dismissed.

This is the first time I heard the name Terry Henry and Michael Sitcov. Mr. Myart informed us that Mr. Sitcov was the supervising attorney and that Mr. Henry was the trial attorney in our case. Mr. Myart would often say that Mr. Sitcov was very difficult to work with and that he was staunchly opposed to the black farmer cases that he had filed.

Mr. Myart said that he simply did not understand why Mr. Sitcov was so opposed to the black farmer cases and that he was stalling the case. Mr. Myart then informed us that he was going to file a motion for mediation in the case. He did file the motion and Judge Flannery ordered all four cases to mediation.

Robert and I arrived in Washington for the mediation. We knew that Mr. Walter Powell, Col. Jim Bowie for his parents, Mr. and Mrs. Jim Bowie and Mr. and Mrs. Welchel Long were also in Washington for their mediations. I knew this because by this time all of us farmers were talking to each other about what had happened to us and how the USDA was discriminating against us and other black farmers.

I believe this was the first time I met Mr. Henry and Mr. Sitcov.

I also met Mr. Perlie Reed, USDA Assistant Secretary for Administration, and Mr. Lloyd Wright, Director, USDA Office of Civil Rights. Mr. Myart said that Mr. Wright and Mr. Reed were the USDA Officials who had the authority to settle our case.

Mr. Myart has said I can not talk about the details of the settlement negotiations. But I will say here that it was obvious that there was very bad blood between Mr. Sitcov and Mr. Myart. It was very contentious. In fact, it was awful how Mr. Myart, Robert and I were treated during the whole process. We forged forward and ultimately settled the case. We were not happy with the settlement as its terms made us seem incompetent and like dishonest people. I was made to feel like this by Mr. Sitcov.

I know that we were treated this way by Mr. Sitcov because we were the first black farmers in the United States to bring ECOA discrimination claims against the government and the first to win our law suit. We started this stuff against the USDA and it forced the USDA to produce the Civil Rights Action Team report which found that thousands of black framers across the United States had been discriminated against by the USDA. What Robert, me and Mr. Myart did further resulted in hundreds of lawsuits against the USDA and settlement of the Pigford Black Farmers Class Action Lawsuit.

Despite the fact that we settled our case, the USDA officials who discriminated against us in Sweetwater, Texas, Dennis Cumbie, Alton Pyburn and Larry Owens were not disciplined by the USDA.

It was during this period and because of the stress associated with the destroying of my family by the USDA Officials and the treatment received from the Department of Justice, that I suffered my first heart attack at a very early age. I was forced to retire from my job at the City of Sweetwater. I was the number one bread winner in the family and this further complicated our financial condition. Life was hopeless and frankly remains that way today given the situation we have been faced with in Court.

Shortly after we settled our first lawsuit, we settled another discrimination complaint, this time in the USDA administrative process. Again, the USDA did not discipline any of the

officials who had discriminated against us. It was as though the government simply did not care. It is my belief that the government still does not care.

This complaint was settled by Mr. Lloyd Wright and Mr. Perlie Reed. So concerned was Mr. Reed about how we were being treated, he traveled to Texas to see Robert and me while I was sick. This settlement agreement provided certain programmatic relief which the USDA violated and which should be apart of this lawsuit.

Further, we were again sent right back to the same officials who discriminated against us in the first place, Dennis Cumbie and Larry Owens, except that they forced us to travel outside Nolan County to be serviced. No white farmers had ever been forced to travel to another county to be serviced by the FSA.

We then filed yet another administrative discrimination complaint against the USDA officials for continuing to discriminate against us on the basis of our color and this time in retaliation for Dennis Cumbie and others including Mr. Don Cruddock. That brings us up to date as to why this lawsuit was filed. After many years of horrible discrimination and degrading treatment, which continues to this day, against my husband and me by the Farm Service Agency Loan Officials in Texas and Washington D.C., we are just plain weary, tired and sick. We had no choice but to file the current law suit because the discrimination, mis-treatment and retaliation against us for staring this thing more than twelve years ago had become just unbearable.

I had a second heart attack and was told by Dr. Hinson and Dr. Clayton that the stress was slowing destroying my heart. Each time I suffered a serious medical problem, Mr. Myart was right there trying to help Robert and me even to the extent of loaning us money.

I incorporate all the factual allegations contained in the complaints in this case, ***Williams, et al v. Veneman,*** et al., 1-03-cv-2245 (CKK). Despite how the government tries to twist these facts, they are true and they represent the horror we continue to suffer.

Robert and I also personally know Clyde Thompson and Frederick Isler and I am keenly aware of their knowledge of the administrative settlements of Dexter Davis, Michael Stovall, Matthew Grant and Richard Grant and our cases. I am aware how the USDA has violated those settlement agreements and how they resist paying black farmers who have been discriminated against.

Robert and I have had in person and phone conversations with Mr. Thompson and Mr. Isler as official representatives of the government. Mr. Thompson and Mr. Isler have been in my daughter's home in Texas to meet with me and my husband over settlement of our administrative discrimination claims of discrimination, the ones that are the subject of this lawsuit.

The US District Court case alleges discrimination against us by the USDA in violation of the Equal Credit Opportunity Act of 1972 and egregious and unconstitutional conduct of two top government officials, Mr. Thompson and Mr. Isler.

While District Judge Colleen Kollar-Kotelly has dismissed the claims against Mr. Thompson and Mr. Isler for reasons that I do not fully understand, her order is not final and it will be appealed. Judge Kollar-Kotelly also issued a ruling that our breach of Contract Claim should be bought in the Federal Court of Claims. We tried that and that case had to be dismissed as well because, according to Mr. Myart, the law provides that by statute. I still do not understand how officials could do this and get a way with by approval of court.

The most recent settlement agreement, the one partially the subject of the federal court case was negotiated by us directly and Mr. Clyde Thompson and Mr. Frederick Isler. Mr. Thompson and Mr. Isler came to Texas after they got permission from our attorney, Mr. Myart, to speak with us about the facts of our administrative claim. Mr. Myart informed us that he thought it was ok because he felt that Mr. Thompson and Mr. Isler were sincere about their efforts to ultimately get out claim settled.

Upon their arrival in Texas at our daughter's home, Mr. Thompson and Mr. Isler said to us that they could settle our claim only if we fired Mr. Myart as our lawyer and that we needed to fire our lawyer right a way because there would be no more black farmer administrative settlements after ours. We even prepared lunch for them. We were very scared and frightened by what Mr. Thompson and Mr. Isler was telling us.

Unfortunately and under pressure from and duress from Mr. Thompson or Mr. Isler, we fired our lawyer, Mr. Myart. In fact, it was either Mr. Thompson or Mr. Isler that actually wrote the letter of termination for us. We signed the termination letter and sent it to Mr. Myart with a copy to Mr. Thompson and the USDA.

After Mr. Thompson and the USDA received the termination letter, Mr. Thompson and Mr. Isler drafted the settlement agreement including what they had promised us in Texas and sent it to us. The settlement agreement drafted by Mr. Thompson and the USDA reflected that we would get $25,000 in compensatory damages and debt relief. We thought the agreement meant that the money was for my husband to get a tractor repaired. We did not understand the term compensatory damages and we were unaware that our claim for such damages was far greater than what they told us.

In this settlement agreement, we later found out that we had given up all rights to all other claims we had against the USDA, including the claim for breach of contract under the 1998 Resolution Agreement.

Mr. Thompson or Mr. Isler knew exactly what they were doing when they coerced us into firing our lawyer and settling our discrimination claims. This was unfair and Mr. Thompson or Mr. Isler took complete advantage of us. My husband did not want to go along with what Mr. Thompson or Mr. Isler were proposing, especially the part about

firing Mr. Myart. He did because like me he was afraid that we would lose out all together if we did not go along with Mr. Thompson or Mr. Isler.

When we showed the agreement to Mr. Myart, after we signed I, and when the local USDA officials did not do what Mr. Thompson and Mr. Isler promised in the agreement, Mr. Myart was in shock and he was extremely angry. He informed us that we had been illegally coerced, wronged again and placed under duress in signing such an unfair non-arms length agreement. He said the settlement agreement was based on the misrepresentations, unconstitutional and illegal conduct of Mr. Thompson and Mr. Isler.

We rehired Mr. Myart to sue the USDA and Mr. Thompson and Mr. Isler.

I have attached the important documents regarding our cases in US District Court and the Federal Court of Claims and I incorporate them as a part of this affidavit. The federal Court Claims case was dismissed. Again, Mr. Myart explained to us that the claims court case had to be dismissed because of the pending case in the federal district court case.

Again, I am expressly aware and have knowledge that those other similarly situated black farmers also settled their administrative discrimination claims. I am aware of this because Michael Stovall, Richard Grant, Matthew Grant and Howard Coats have settlement agreements similar, almost exactly the same but for facts specific to each of them, to our first administratively settled discrimination case. Mr. Wright settled that case with us.

All of us black farmers talked and still talk on a regular basis and we share our personal stories on how USDA and the FSA discriminated against us and how despite the settlement in our cases and the over $800,000,000 settlement in *the* ***Pigford v. Veneman*** and the ***Brewington v. Veneman*** Class Black Farmer Class Action Lawsuits, the USDA and FSA officials in the state and national offices were continuing to discriminate against black farmers. We all joined the National Black Farmers Association and the Black Farmers and Agriculturalists Association. We all verbally shared and compared our settlements with each other and the black farmers in these groups.

The FSA Officials who discriminated against us, including Mr. Thompson and Mr. Isler, in furtherance of the discrimination, were not disciplined by the USDA and they were the same officials placed in charge of executing the programmatic relief provisions outlined in the settlement agreement. The discrimination has never stopped.

It was my understanding that Mr. Thompson and Mr. Isler were responsible for executing and monitoring the settlement agreements to insure that we and the other black farmers got what they were entitled to under the settlement agreements.

When it became obvious to us that neither the FSA officials in Texas and Washington, D.C., including Mr. Thompson and Mr. Isler, were concerned about our rights nor our farming operation and that they were willfully and maliciously violating the agreement, we had no choice but to sue.

We even met with Secretary of Agriculture, Ms. Ann Veneman and the present acting Secretary of Agriculture Chuck Conner when he worked in the White House as Special Assistant to President George Bush. Nothing has happened.

We met in the White House with President Bush in the White House who said he wanted our claims settled.

The Black farmers became so upset that they began to shut done offices of the FSA in protest. This was done in Brownsville, Tennessee in 2002 or thereabouts. After the Tennessee protest, the black farmers including me and my husband were invited to meet on or about July 16, 2002, in Washington DC to meet with Secretary Ann Veneman, Clyde Thompson, Mr. Isler and Ms. Arlene Leland, USDA Deputy General Counsel for Civil Rights. Robert and I , despite my medical condition, went to those meetings in Washington DC. The meetings were held at the La' Efant Plaza Hotel and in the USDA Conference Room in the USDA'S Whitten Office Building.

During the two meetings, Robert and I presented our horror stories to the entire panel and we discussed how the USDA officials were continuing to discriminate against us. We did so only after Mr. Myart gave us permission to discuss our cases in the open panel meeting. The panel included Mr. Thompson and Mr. Isler. After we discussed the cases, Robert and I were asked questions about the prior settlement agreements the programmatic relief provisions, and the continued malicious, retaliatory conduct of the USDA officials at the state and national levels.

In fact, all the framers in attendance at the meeting included Gary Grant, Richard Grant, Dexter Davis, Michael Stovall us and many other black farmers. All the farmers with these administrative civil rights complaints especially those with the settlement agreements discussed in detail during the panel meetings at the La' Efant Plaza Hotel and at the Department of Agriculture meeting with Secretary Ann Veneman. Mr. Thompson and Mr. Isler were in attendance at the Veneman meeting as well and they promised me and Robert as well as Mr. Myart that they wanted to settle our case. It was a serious of misrepresentations by all these government officials.

During the course of this law suit, Mr. Myart has tried desperately to get the information he needed and that was being asked for by Mr. Paul Dean. I think Mr. Dean is the third or fourth lawyer for the government in this case.

Mr. Myart has not mis-represented my medical condition to the Court. He is fully aware of my medical condition and he has gotten at least two medical reports that prove that I am very sick. There were times when Mr. Myart would call our home to discuss the discovery questions and documents we had on hand. I was simply too sick to respond to his questions and, in fact, I lost a whole set of documents from Mr. Myart's office that contained to questions being asked. Mr. Myart repeatedly told Robert and me that it was essential that he get that information back to send to Mr. Dean and the Department of Justice.

Mr. Myart called and said that he had to get a statement from my doctor regarding my medical condition. He said he needed to send Dr. Clayton a letter so that he could get a complete report in order to send to the Judge Facciola.

In fact, Judge Facciola conducted a hearing with me and my physician, Dr. Clayton. I told the judge that I had been a very sick woman and that Mr. Myart had tried to get the information requested. Judge Facciola did not seem interested in my explanation. He was only interested in whether I could go forward with the case. I told him that I wanted to go forward with the law suit and that I would do the best I could. I even apologized to the Court.

I recall Mr. Myart telling me that after the hearing in early late November or early December that he felt Judge Facciola was biased against him because of the failed mediation and because Judge Kollar-Kotelly had taken Judge Facciola's motion to Show Cause and Sanction Mr. Myart under advisement.

Mr. Myart informed Robert and me that he had asked Judge Facciola if he could present more information regarding mediation in the case. Mr. Myart did so and he was shocked that Judge Facciola then filed a show cause motion against him for doing what he had been given approval to do.

Mr. Myart explained to me and Robert why he felt the mediation was failure. Mr. Myart has informed me that I can not divulge in this affidavit his reasons for saying that the mediation failed. He said that matter was going to be discussed under seal in another document he planned to file with the Court.

Mr. Myart also told me that Judge Facciola screamed at him in another hearing because he told it did not matter what he said Judge Facciola was going to rule in favor of the government every time no matter the arguments he was making or was going to make.

Robert and I support the Motion to Recuse Judge Facciola and we believe sincerely that the orders regarding discovery by Judge Facciola are biased and unfair based on the fact that Mr. Myart tried but was unable to get from me the information requested.

The Court is informed that Robert can not read or write. Mr. Myart was absolutely correct about that. Even more, Robert gets so upset and confused because he is so devastated by what the government has done to us and our family and that they have again accused him of mis-conduct, that he has been and is unable to help Mr. Myart with the discovery in this case. We have been under the care of Dr. Hinson for years over this and other personal family issues including loss of love and affection.

Even more, Judge Facciola never even considered Dr. Hinson's report nor my medical doctor's letter sent to the court on December 4, 2006, the actual note written by Dr. Clayton which Mr. Myart submitted. Judge Facciola instead issued orders (1) limiting production of evidence regarding similarly situated white farmers; (2) limiting production of evidence regarding medical treatment of Robert and me; (3) prohibiting us from

introducing any additional evidence regarding the legal contention in the Amended Complaint that, by law, "all such [Farm Service Agency] loans are extended to first time and socially disadvantaged farmers"; (4) limiting production of evidence relating to damages; and, (5) forcing Robert and me to forego the introduction of witnesses at trial and (6) charging Mr. Myart fines for something he had no control over.

Judge Facciola did this after Mr. Myart told the truth about my medical condition, my inability to help with the litigation because I was too sick and that Robert could not help with the litigation because he does not read and write and because he gets too emotional.

Robert and I also believe that Judge Facciola's screaming at our attorney, calling him graceless and cavalier is just wrong and designed only to downgrade Mr. Myart and Robert and me.

Mr. Myart has never used my illness not to do what he was supposed to do in Court.

Mr. Myart has been through this whole horrible ordeal with Robert and me as he has with hundreds of other farmers. He, too, has gotten sick behind trying to right the wrongs the Department of Agriculture has done not only to me and Robert but to thousands of Black Farmers all over the country.

Judge Facciola's September 4 order and opinion, more than 50 pages, contains things that are designed only to hurt us and our attorney. Most of it is biased and does not even relate to the discovery problems in the case. I believe they are designed only to upset Judge Kollar-Kotelly.

Yes, may be Mr. Myart has made some mistakes. But Robert and I do not believe he has he has ever misrepresented anything to the Court and we know he has tried everything in his power to get this case going.

This is why I believe independent from Mr. Myart's conversations with us that Judge Facciola has been very biased toward him and us and that we can not possibility get a fair trial unless his rulings are overturned and the sanctions he has ordered are reversed.

Robert and I want to proceed with our case before Judge Kollar-Kotelly and we want Mr. Myart to continue to be our lawyer.

AFFIANT SAYETH FURTHER NOT.

Laverne Williams

SUBSCRIBED AND SWORN before me on the 13th day of November, 2007.

Notary Public

LISA ADAMES
Notary Public, State of Texas
My Commission Expires
JULY 28, 2010

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MICHAEL W. STOVALL<br><br>v.<br><br>UNITED STATES OF AMERICA | ) | No. 05-400C<br>(Judge Allegra) |

## AFFIDAVIT OF LAVERNE WILLIAMS

Before me was LAVERNE WILLIAMS who was deposed and said the following:

"My name is LAVERNE WILLIAMS. I am over 18 years old and I am capable of making this affidavit. I have personal knowledge of the facts stated herein and they are stated to the best of my recollection and ability. I make this affidavit under the penalty and understanding of perjury.

I know Mr. Michael Stovall, a fellow black farmer, and many other black farmers, including Dexter Davis and Richard Grant, now deceased, who got administrative settlements through the USDA Office of Civil Rights. I also know Walter Powell and Welchel Long, now deceased, who got hard fought settlement agreements as a result of their federal court cases.

I also personally know Clyde Thompson and Frederick Isler and I am keenly aware of their knowledge of the administrative settlements of Dexter Davis and Michael Stovall. I have had in person and phone conversations with Mr. Thompson and Mr. Isler. Mr. Thompson and Mr. Isler have been in my daughter's home in Texas to meet with me and my husband, Robert Williams over settlement of our administrative discrimination claims of discrimination.

After many years of horrible discrimination and degrading treatment, which continues to this day, against my husband and me by the Farm Service Agency Loan Officials in Texas and Washington D.C., we settled a US District Court case and two administrative discrimination claims against the United States Department of Agriculture in 1998. We are presently in US District Court in suit against the USDA, Mr. Clyde Thompson and Mr. Frederick Isler for the same discrimination that resulted in prior settlments.

The US District Court case alleges discrimination against us by the USDA in violation of the Equal Credit Opportunity Act of 1972 and egregious and unconstitutional conduct of two top government officials, Mr Thompson and Mr. Isler. While District Judge Colleen Koyler-Kotelly has dismissed the claims against Mr. Thompson and Mr. Isler, her order

is not final and it will be appealed. Judge Koyler-Kotelly also issued a ruling that our breach of Contract Claim should be bought in the Federal Court of Claims

The attorney who negotiated the our first court case and our first administrative settlements on our behalf was and is now Mr. James W. Myart, Jr. Mr. Lloyd Wright, former Director, Office of USDA Civil Rights, negotiated and signed the settlement on behalf of the USDA

The most recent settlement agreement, the one partially the subject of the federal court case was negotiated by us directly and Mr. Clyde Thompson and Mr. Frederick Isler. Mr. Thompson and Mr. Isler came to Texas after they got permission from our attorney, Mr. Myart, to speak with us about the facts of our administrative claim. Mr. Myart informed us that he thought it was ok because he felt that Mr. Thompson and Mr. Isler were sincere about their efforts to ultimately get out claim settled.

Upon their arrival in Texas at our daughter's home, Mr. Thompson and Mr. Isler said to us that they could settle our claim only if we fired Mr. Myart as our lawyer and that we needed to fire our lawyer right a way because there would be no more black farmer administrative settlements after ours. We were very scared and frightened by what Mr. Thompson and Mr. Isler were telling us.

Unfortunately and under pressure from and duress from Mr. Thompson or Mr. Isler, we fired our lawyer. In fact, it was either Mr. Thompson or Mr. Isler that actually wrote the letter of termination for us. We signed the termination letter and sent it to Mr. Myart with a copy to Mr. Thompson and the USDA.

After Mr. Thompson and the USDA received the termination letter, Mr. Thompson and Mr. Isler drafted the settlement agreement including what they had promised us in Texas and sent it to us. The settlement agreement drafted by Mr. Thompson and the USDA reflected that we would get $25,000 in compensatory damages and debt relief. We thought the agreement meant that the money was for my husband to get a tractor repaired. We did not understand the term compensatory damages and we were unaware that our claim for such damages was far greater than what they told us.

This was unfair and Mr. Thompson or Mr. Isler took advantage of us. My husband did not want to go along with what Mr. Thompson or Mr. Isler were proposing, especially the part about firing Mr. Myart. He did because like me he was afraid that we would lose out all together if we did not go along with Mr. Thompson or Mr. Isler.

When we showed the agreement to Mr. Myart, after we signed I, and when the local USDA officials did not do what Mr. Thompson and Mr. Isler promised in the agreement, Mr. Myart was in shock and agnry. He informed us that we had been wronged again and placed under duress in signing such an unfair agreement based on the misrepresentations, unconstitutional and illegal conduct of Mr. Thompson and Mr. Isler.

We rehired Mr. Myart to sue the USDA and Mr. Thompson and Mr. Isler.

I have attached the important documents regarding our cases in US District Court and the Federal Court of Claims and I incorporate them as a part of this affidavit. The federal Court Claims case was dismissed. Mr. Myart explained to us that the claims court case had to be dismissed because of the pending case in the federal district court case.

Again, I am expressly aware and have knowledge that those other similarly situated black farmers also settled their administrative discrimination claims. I am aware of this because Michael Stovall, Richard Grant, Matthew Grant and Howard Coats have settlement agreements similar, almost exactly the same but for facts specific to each of them, to our first administratively settled discrimination case. Mr. Wright settled that case with us.

All of us black farmers talked and still talk on a regular basis and we share our personal stories on how USDA and the FSA discriminated against us and how despite the settlement in our cases and the over $800,000,000 settlement in *the* ***Pigford v. Veneman*** and the ***Brewington v. Veneman*** Class Black Farmer Class Action Lawsuits, the USDA and FSA officials in the state and national offices were continuing to discriminate against black farmers. We all joined the National Black Farmers Association and the Black Farmers and Agriculturalists Association. We all verbally shared and compared our settlements with each other and the black farmers in these groups.

The FSA Officials who discriminated against us, including Mr. Thompson and Mr. Isler, in furtherance of the discrimination, were not disciplined by the USDA and they were the same officials placed in charge of executing the programmatic relief provisions outlined in the settlement agreement. The discrimination has never stopped.

It was my understanding that Mr. Thompson and Mr. Isler were responsible for executing and monitoring the settlement agreements to insure that we and the other black farmers got what they were entitled to under the settlement agreements.

When it became obvious to us that neither the FSA officials in Texas and Washington, D.C., including Mr. Thompson and Mr. Isler, were concerned about our rights and our farming operation and that they were willfully and maliciously violating the agreement, we had no choice but to sue. We even met with Secretary of Agriculture, Ms. Ann Veneman and the present acting Secretary of Agriculture Chuck Conner when he worked in the White House as Special Assistant to President George Bush. Nothing has happened.

After the Tennessee protest, the black farmers including me and my husband were invited to meet on or about July 16, 2002, in Washington DC to meet with Secretary Ann Veneman, Clyde Thompson, Mr. Isler and Ms. Arlene Leland, USDA Deputy General Counsel for Civil Rights. Robert and I went to those meetings in Washington DC. The meetings were held at the La' Efant Plaza Hotel and in the USDA Conference Room in the USDA'S Whitten Office Building.

During the two meetings, Robert and I presented our horror stories to the entire panel and we discussed how the USDA officials were continuing to discriminate against us. We did so only after Mr. Myart gave us permission to discuss our cases in the open panel meeting. The panel included Mr. Thompson and Mr. Isler. After we discussed the cases, Robert and I were asked questions about the prior settlement agreements the programmatic relief provisions, and the continued malicious, retaliatory conduct of the USDA officials at the state and national levels.

In fact, all the framers in attendance at the meeting included Gary Grant, Richard Grant, Dexter Davis, Michael Stovall us and many other black farmers. All the farmers with these administrative civil rights complaints especially those with the settlement agreements discussed in detail during the panel meetngs at the La' Efant Plaza Hotel and at the Department of Agriculture meeting with Secretary Ann Veneman. If my memory serves me correctly, Mr. Thompson and Mr. Isler were in attendance at the Veneman meeting.

I heard Mr. Stovall, Mr. Grant and Mr. Davis discuss their settlement agreements in detail at both meetings.

Mr. Thompson's assertion that he was not involved and does not know about Michael Stovall's case or the other black farmer administrative cases, the settlement agreement(s) and the breaches of the settlement agreement(s), including the Michael Stovall alleged breach is just not true.

AFFIANT SAYETH FURTHER NOT.

LaVerne Williams

**SUBSCRIBED AND SWORN before me on this 9th day of November, 2007.**

Notary Public

KATHY BLUEFORD
Notary Public, State of Texas
My Commission Expires
APRIL 5, 2011

FILED
FEB 2 2 2006
U S COURT OF FEDERAL CLAIMS

IN THE UNITED COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ROBERT WILLIAMS and LAVERNE WILLIAMS<br><br>Plaintiffs<br><br>v.<br><br>THE UNITED STATES OF AMERICA<br><br>Defendant | ) | 06-124 C |

## COMPLAINT

ROBERT WILLIAMS and LAVERNE WILLIAMS ("PLAINTIFFS") complain of THE UNITED STATES OF AMERICA, by and through its agents, Mike Johanns, Secretary of Agriculture (USDA), Clyde Thompson ("THOMPSON"), Deputy Assistant Secretary for Civil Rights, and Fred Isler ("ISLER") former Assistant Director, USDA Office of Civil Rights ("OCR"), and would show upon the Court the following:

### I. JURISDICTION AND VENUE

1. Jurisdiction and venue lies in the Court of Federal claims pursuant to the Tucker Act, 28 U.S.C. § 1346(a) (2).

### II. PARTIES

2. Plaintiffs ROBERT WILLIAMS and LAVERNE WILLIAMS, husband and wife, are residents of Roscoe, Nolan County, Texas.

3. Defendant THE UNITED STATES OF AMERICA is the sovereign served with

process by the Clerk of this Court via delivery of the Complaint to the United States Attorney General.

## III. PROCEDURAL BACKGROUND

4. On November 3, 2003, Plaintiffs filed suit against Secretary Ann Veneman[1] raising constitutional claims, violations of the Equal Credit Opportunity Act and breach of contract alleging fraud, misrepresentation and interference with the attorney-client relationship. The Original Complaint in said action is attached hereto, marked Exhibit 1; same being incorporated as if fully set forth verbatim. In deference to rights of the Plaintiffs, the undersigned dropped his personal claim of interference of the attorney-client relationship in subsequent filings In an order filed November 3, 2003, the Honorable Judge Collen Collier-Kotelly, presiding, United States District Court for the District of Columbia, dismissed[2] the Plaintiffs' contract claim; and, in so doing, opined

---

[1] ***Williams v. Johanns,*** Civ. Action Number 03-2245 (CKK). The Honorable Mike Johanns is the successor-in-interest to former Secretary Ann Veneman.

[2] Judge Kotelly's opinion with regard to the Plaintiffs' contract claim is included here verbatim because of its significance relating to the illegal contract formation by ISLER and THOMPSON, to wit:

> ***Contract Law Claims***
>
> To the extent that Plaintiffs are making contract claims against Defendant regarding the 2002 settlement agreement, this Court lacks jurisdiction over such claims. The Tucker Act, 28 U.S.C. § 1346, gives the Court of Federal Claims exclusive jurisdiction over contract claims exceeding $10,000. *Stovall*, 2005 U.S. Dist. LEXIS 5188, at *14-15 (citing 28 U.S.C. § 1346(a) (2), *Mitchell*, 463 U.S. at 215); *see also Waters v. Rumsfeld*, 320 F.3d 265, 270 (D.C. Cir. 2003) ("[C]laims 'exceeding the $10,000 jurisdictional ceiling . . . are within the exclusive jurisdiction of the Court of Claims.'") (Quoting *Goble v. Marsh*, 684 F.2d 12, 15 (D.C. Cir. 1982)).
>
> In this circuit, a settlement agreement is considered a contract for the purposes of the Tucker Act. *Shaffer v. Veneman*, 325 F.3d 370, 372 (D.C. Cir. 2003). Therefore, Plaintiffs claim that Defendants' fraudulently induced them to enter into the 2002 settlement agreement is under the exclusive jurisdiction of the Court of Federal Claims. *Hansson v. Norton*, No. 04-5157, 2005, 11 U.S. App. LEXIS 10799, at *1 (D.C. Cir. June 10, 2005) ("This court generally treats settlement agreements as contracts subject to the exclusive jurisdiction of the Court of Federal Claims."); *see also Brown v. United States*, 389 F.3d 1296, 1297 (D.C. Cir. 2004) ("[B]ecause this contract question arises in a suit against the United States for more than $10,000 in damages, jurisdiction to decide whether the Department breached the settlement agreement lies exclusively in the Court of Federal Claims.").
>
> Plaintiffs' claims about allegedly fraudulent behavior by Messrs. Isler or Thompson during the

that (a) such claims should be brought in the Court of Federal Claims because the contract breach complained of exceeded $10,000 (b) the Federal Court of Claims has exclusive jurisdiction hereof; and, (c) ISLER and THOMPSON alleged unconstitutional, fraudulent. misrepresentation, duress and interference with the attorney-client relationship actions in formation and breach of the 2002 Resolution Agreement ("the Agreement") between the Plaintiffs and USDA should be brought in this court. The Agreement, the subject of this action. is attached hereto, marked Exhibit 2; same being incorporated as if fully set forth verbatim.

5. Pursuant to the District Court July 20, 2005 Scheduling Order, on August 15, 2005, Plaintiffs filed a Motion to Reinstate and Transfer Contract Claim to the United States Court of Claims and for Reconsideration of Dismissal of Constitution Claim.

6. On October 24, 2005, the District Court denied the Plaintiffs' Motion to Re-instate and Transfer Contract Claim to the United States Court of Claims and for Reconsideration of Dismissal of Constitution Claim, again, urging Plaintiffs to file the instant claim in the Federal Court of Claims.

7. Plaintiffs, upon instruction of the District Court, now file suit in the Federal Court of Claims seeking the Court administer justice and award damages.

## IV. FACTUAL BACKGROUND

### A. PLAINTIFFS' HISTORY (NIGHTMARE) WITH USDA

---

settlement negotiations could be appropriate in the Court of Federal Claims if the Plaintiffs were challenging the formation of the settlement under a contract claim. Because any potential contract claim would have to be brought before the Court of Federal Claims, Defendants' motion to dismiss Plaintiffs' claims relating to the size of the settlement agreement and Defendants' behavior during negotiations shall be granted.

*Williams v. Johanns*, Civ. Action Number 03-2245 (CKK), D.C. District Court, Memorandum and Opinion, July 5, 2005

Case 1:06-cv-00124-MCW Document 1 Filed 02/22/2006 Page 4 of 15

8. Plaintiffs ROBERT WILLIAMS and LAVERNE WILLIAMS operate a small farm in Roscoe, Texas.

9. In 1995, Plaintiffs were the very first black farmers[3] to file suit against the Secretary of Agriculture invoking the Civil Rights Act, Title VI, and Equal Credit Opportunity Act ("ECOA") because of insidious, intentional racial discrimination when Plaintiffs attempted to avail themselves to USDA'S federally assisted and farm loan programs.

10. Despite the settlement of their 1995 lawsuit, Plaintiffs continued to be victimized by USDA. On or about January 15, 2002, Plaintiffs applied for a Farm Service Agency[4] (FSA) farm and home loan to operate their 1000 acre farm. On or about February 8, 2002, Plaintiffs were informed by Don Craduck, the local FSA official in Fisher County, Texas, that their loan application was complete and all procedures for loan approval were complete.

11. Interested in and concerned about the status of their loan, on or about February 22, 2002, Plaintiffs contacted Sam Snyder, a FSA Loan Official in Washington, D.C. The following week, Snyder advised Plaintiff LaVerne Williams that there had been some holdups because of complaints from local white farmers. Plaintiffs were justifiably alarmed considering local white farmers had harassed Plaintiffs for the previous 13 years.

12. On information and belief, Craduck discussed Plaintiffs' farm and home loan

---

[3] The Williams case was the predecessor case to Pigford v. Veneman, ______ and Brewington v. Veneman, ___ ______ the class actions law suits in the District of Columbia that yielded millions to approximately 14,000 black farmer class members. It was the Williams matter that ultimately resulted in the US Department of Justice, Office of General Counsel, issuing a legal memorandum, known as the "Dellinger Report" confirming that the ECOA applied to the United States government when functioning as a lender.

[4] The Farm Service Agency is an agency within the USDA legally responsible for the administration of the government's farm loan and subsidy programs.

application with other parties including local white farmers. As a result, the news of Plaintiffs' loan application was brought to the attention of Plaintiffs' creditors causing the creditor to immediately file liens against Plaintiffs' property in an effort to obstruct Plaintiffs' loan application. Plaintiffs were also advised by Craduck that the outcome of their application was delayed as he needed additional information.

13. On or about March 15, 2002, Plaintiffs discovered that Craduck had investigated the existence of liens on Plaintiffs' property on three different occasions. Upon information and belief, Craduck was delaying the application while, on information and belief, he unlawfully recruited opposition to the Williams' loan among local white farmers and other FSA officials.

14. On or about April 10, 2002, Plaintiffs contacted Carolyn Cooksie, FSA Deputy Administrator, to discuss the handling of their loan application. Ms. Cooksie advised Plaintiffs to pay off any liens on the property. Following Ms. Cooksie's advice, Plaintiffs paid off the liens. After Plaintiffs advised Craduck that their liens had been paid off, he told them they needed to show $3,000 in their bank account in order for the farm operation to show cash flow. Out of sheer frustration, Plaintiffs gave up. Every time they complied with FSA instructions, additional obstacles were placed in the way that prevented the processing of their loan application.

15. On or about May 9, 2002, Plaintiffs filed a discrimination complaint with OCR. OCR commenced an investigation. After completing that investigation, Jerome Williams, an OCR investigator, on information and belief, informed USDA that Plaintiffs had been discriminated against with regard to their 2002 application.

16. On or about July 6, 2002, Plaintiffs and at least 40 other black farmers traveled to

Case 1:06-cv-00124-MCW Document 1 Filed 02/22/2006 Page 6 of 15

Washington, D.C. at the invitation of Secretary Ann Veneman to meet with her to discuss resolution of their discrimination complaints. While in D.C. in July 2002, Plaintiffs spoke directly with Secretary Ann Veneman, ISLER and THOMPSON regarding their case, and they were assured by ISLER and THOMPSON that their case would be settled.

17. Shortly after the meeting, ISLER and THOMPSON expressed an interest to Plaintiffs and their Counsel, the undersigned, in traveling to Texas to interview Plaintiffs and obtain more information regarding their 2002 discrimination complaint.

18. In good faith, Plaintiffs' attorney gave ISLER and THOMPSON permission to meet with Plaintiffs outside his presence for the express purpose of gathering more information regarding their complaint.

19. ISLER and THOMPSON, in fact, traveled, that very weekend, to Texas to meet with Plaintiffs in the presence of the daughters, Gwen Williams and Crystal Goodman.

20. The meeting was by no means an interview for additional evidence or material upon which to make a Final Agency Decision.[5] Instead, ISLER and THOMPSON took advantage of the opportunity to talk to Plaintiffs outside the presence of their attorney to pressure them into settlement of their claims.

21. During the meeting in Texas, ISLER and THOMPSON, using their superior bargaining power, unduly influenced Plaintiffs to terminate their Counsel, James W. Myart, Jr., the undersigned, claiming Plaintiffs' case would not settle at all if Myart continued to represent them. ISLER and THOMPSON then drafted a termination letter to Mr. Myart and prompted Plaintiffs to send the letter, which they did, to Myart. ISLER and THOMPSON told Plaintiffs by terminating Myart the USDA would definitely be

---

[5] Final Agency Decision is the formal device used to render, pursuant to 7 CFR 2.25, et seq., a positive or negative decision that discrimination occurred in violation of federal law.

able to settle their claims.

22. After securing the Plaintiffs' agreement to terminate their counsel during the meeting, ISLER and THOMPSON continued to pressure Plaintiffs into agreeing to a settlement in which they would receive $25,000 for the repair of a tractor and land debt relief of approximately $400,000. The verbal agreement did not provide for payment of compensatory damages as allowed by the ECOA. Several weeks of non-arms-length, intense telephone discussions occurred between Plaintiffs, their daughters and ISLER and THOMPSON.

23. ISLER and THOMPSON drafted the Agreement and sent it to the Plaintiffs. Being assured by ISLER and THOMPSON the Agreement reflected the same verbal agreement made in Texas, the Plaintiffs, without counsel or legal advice, signed the agreement.

24. Myart did not become aware of the verbal agreement or the executed Agreement until sometime after they, the agreements, verbal and express, had been made, executed and paid. The Agreement contained a clause for the payment of his attorney's fees; and, if not filed within thirty (30) days of the Agreements execution, he, Myart, would waive any right to payment of attorney's fees.

25. ISLER and THOMPSON unconscionably and insidiously (a) misrepresented the purpose of their visit to the Plaintiffs; (b) induced, employing duress, the Plaintiffs into terminating their counsel; (c) negotiated, employing duress with the intent to cause emotional distress, a non-arms length agreement with Plaintiffs knowing they had violated the attorney-client relationship; (d) misrepresented the $25,000 payment as funds for the repair of a tractor, yet expressly stated in the Agreement that the $25,000 was for compensatory damages; (e) did so with the intent to conceal and knowing that the

Case 1:06-cv-00124-MCW Document 1 Filed 02/22/2006 Page 8 of 15

Agreement, ostensibly representing full payment for the Plaintiffs' damages, was valued far less than similar such agreements based on the same type claims, i.e., among others, the ***In Re: Will Sylvester Warren***[6], USDA Docket No. 1194, HUDALJ No.00-19-NA, which provided over six million ($6,000,000) in compensatory damages allowed pursuant to the ECOA. On information and belief, USDA, ISLER and THOMPSON knew of the existence of the Warren decision prior to its issuance on December 19, 2002; and, thereby, they all recognized the USDA'S exposure in the Plaintiffs' claims.

26. On information and belief, the prior knowledge of the USDA'S exposure in Plaintiffs' claims is what motivated the USDA, ISLER and THOMPSON to embark on the above-delineated illegal conduct.

27. After lodging formal complaints regarding the formation and circumstances underlying the Agreement and the manner in which it was obtained, then Secretary Ann Veneman, represented to Plaintiffs that a thorough investigation would be conducted. She also assured Plaintiffs that if their claims were affirmed, immediate relief would be provided.

28. In spite of clear evidence of official misconduct in procuring the Agreement and the Secretary's commitment to the contrary, USDA did not conduct the promised investigation, nor did it provide any form of relief. In fact, neither then Secretary Veneman, nor the USDA, has ever responded to Plaintiffs' formal complaints.

29. Plaintiffs, as afore mentioned, applied for loans subsequent to the Agreement. Those loans are the subject of the ECOA claims pending in the District Court, and they represent a material breach in the Agreement resulting in further injury to Plaintiffs,

---

[6] ***In Re: Will Sylvester Warren***, USDA Docket No. 1194, HUDALJ No.00-19-NA is attached, hereto, marked Exhibit 3; same being incorporated herein as if fully stated verbatim. (Analyses, in detail, of damages allowed pursuant to the ECOA.)

claim for which is made here.

30. Commencing in January 2003, Plaintiffs, again, attempted to secure loans and services from USDA. The Agreement provided, among other things, "The release of all debt will not be used by USDA or FSA in any negative manner in conjunction with Mr. and Mrs. Williams' application for or participation in, any USDA or FSA program, benefit or activity." Defendant is in total breach of this provision, among others. See Exhibit 1.

31. Plaintiffs are entitled to recover their reasonable attorneys' fees, including paralegals' fees, and expenses associated with the litigation of their claims. Plaintiffs are entitled to recover a sum from Defendants to compensate Plaintiffs a reasonable amount for their attorneys' fees, including paralegals' fees, in the preparation and prosecution of this action as well as a reasonable fee for any and all appeals to other courts.

## V.
## CAUSES OF ACTION

### FRAUD, MISREPRESENTATION AND COERCION IN FORMATION OF SETTLEMENT AGREEMENT/CONTRACT

32. Plaintiffs restate and re-allege paragraphs 1-31, above, as if fully stated herein and would further show the Court as follows:

32. USDA, by and through its agents, ISLER and THOMPSON, forced and coerced, through material misrepresentation and fraud, the 2002 Resolution Agreement upon Plaintiffs. Plaintiffs entered into the contrived Agreement without advice of Counsel. Plaintiffs were placed under duress and were subjected to material misrepresentations in the Agreement, fraud, non-arms length negotiation based on fabrication and with the intent to deceive Plaintiffs to Plaintiffs' detriment and injury as above alleged.

33. Specifically, USDA, by and through its agents, ISLER and THOMPSON, did the following illegal acts:

(a) made a false, material assertion(s) as to the purpose(s) of terminating the Plaintiffs' Counsel and the actual Agreement/contract;

(b) had knowledge of the falsity and/or a high degree of disregard for whether the assertion(s) was correct;

(c) intended the false assertion(s) to induce the Plaintiffs to settle the agreement without the benefit of Counsel knowing the Plaintiffs would rely on the falsity and material assertion(s);

(d) Plaintiffs' justifiably relied the false, material assertion(s) since the actors represented the United States government and had the authority to make a settlement; and,

(e) Plaintiffs were, indeed, damaged as a result of the false, material assertion(s).

34. At the time the material assertions were made, USDA, by and through its agents, was aware of ***In Re: Will Sylvester Warren*** and the potential damages due Plaintiffs pursuant to the legal analysis therein. USDA intentionally with held this information for the express purpose of denying Plaintiffs the value of their claim. Plaintiffs' seek the Agreement be voided and that USDA compensate Plaintiffs based on said damages in accordance with the legal analysis as in ***In Re: Will Sylvester Warren.***

## BREACH OF CONTRACT

35. Plaintiffs restate and re-allege paragraphs 1-31, above, as if fully stated herein and would further show the Court as follows:

36. 34. Even though Plaintiffs claim that the Agreement was fraudulent induced and should be voided as a matter of law, USDA, by and its agents, ISLER and THOMPSON, breached said Agreement with Plaintiffs in, but not limited to, the following ways, each of which proximately caused Plaintiffs' damages, as described above and as follows:

a. Their handling of Plaintiffs' loan applications subsequent to the 2002 Resolution Agreement:

b. Their denial of Plaintiffs' loan application submitted subsequent to the January 2002 Resolution Agreement; and

c. Their misrepresentation of the compensatory damages section of the 2002 Resolution Agreement.

37. Plaintiffs' pecuniary and non-pecuniary damages were consequential and foreseeable by USDA; and. Plaintiffs allege that such actions were in furtherance of the Defendants' discrimination against Plaintiffs.

38. Plaintiffs' loss of income was foreseeable by USDA and Plaintiffs allege that such acts were in furtherance of the Defendants' discrimination against Plaintiffs.

39. Plaintiffs seek recovery of all foreseeable and consequential damages as a result of the Defendant's intentional breach of contract.

40. Plaintiffs are entitled to recover his attorneys' fees from Defendants to compensate Plaintiffs for a reasonable fee for his attorneys' fees and costs in the preparation and prosecution of this action as well as a reasonable fee for any and all appeals to other courts.

## PRAYER

WHEREFORE, Plaintiffs ROBERT WILLIAMS and LAVERNE WILLIAMS request that Defendant UNITED STATES OF AMERICA be required to appear and answer herein, and that the Court:

Grant Plaintiffs ROBERT WILLIAMS and LAVERNE WILLIAMS'S judgment against the United States for:

(1) Fraud, coercion and misrepresentation in formation of the 2002 Agreement;

(2) Interference with the Plaintiffs' client/attorney contract;

(3) Breach of Contract damages and all forseeable and consequential damages flowing from (a) fraud, coercion and misrepresentation in formation of the 2002 Agreement and (b) interference with the Plaintiffs' client/attorney contract, up to and including $10,000,000; and (c) damages resulting from denial of post 2002 loan applications constituting breach of the 2002 Agreement.

(4) Damages resulting from the breach of agreed injunctive relief not provided pursuant to the 2002 Resolution Agreement;

(5) All injunctive and equitable relief provided under the Resolution Agreement;

(6) Reasonable attorney's fees, costs and expenses;

(7) Costs of suit; and

(8) such other and further relief as appears just and equitable.

Respectfully submitted,

James W. Myart, Jr. P.C.
1104 Denver Blvd, Suite 300
San Antonio, Texas 78210
Phone: (210) 533-9461
Fax: (210) 533-4815

By: ______________________
James W. Myart, Jr.
Federal Bar No. TX 0021

ATTORNEYS FOR PLAINTIFFS

| fax transmittal memo 7671 | # of pages |
|---|---|
| To James Myart | From Robert Williams |
| Co. | Co. |
| Dept. | Phone # (915) 766-3011 |
| Fax # 202-638-6740 | Fax # (915) 766-3727 |



# UNITED STATES OF AMERICA DEPARTMENT OF AGRICULTURE

## SETTLEMENT AGREEMENT

This agreement is by and between the claimants, Robert and LaVerne Williams, and the United States Department of Agriculture (USDA). This agreement constitutes a full, complete, and final settlement of all claims in Mr. and Mrs. Williams' administrative complaints submitted to USDA and of any claims that Mr. and Mrs. Williams might have against USDA arising from the events and issues set forth in their complaints. This agreement is authorized by statute, USDA regulations, and the Equal Credit Opportunity Act.

The parties wish to set forth the terms of the agreement in writing. The agreement is entered into for the purpose of resolving Mr. and Mrs. Williams' claims for relief in a mutually acceptable, voluntary agreement. The parties agree that they are entering into this Settlement Agreement voluntarily, without coercion or duress, and that they fully understand the terms of the Agreement. This Settlement Agreement shall not constitute an admission of liability or misconduct on the part of the Agency or its past or present agents, employees, representatives or officers.

### USDA Agrees:

1. To discharge any and all of Mr. and Mrs. Williams' debt owed to the Farm Service Agency. The agreed upon debt relief will be implemented no later than 30 calendar days after this agreement has been signed by all parties. The release of all debt to USDA will not be used by USDA or FSA in any negative manner in conjunction with Mr. and Mrs. Williams' application for, or participation in, any USDA or FSA program, benefit or activity. This release will not trigger the statutory provisions found at Section 648 of the Federal Agriculture Improvement and Reform Act of 1996 that preclude an individual who has received debt forgiveness from obtaining future loan from USDA or from obtaining future debt forgiveness.

2. To pay Mr. and Mrs. Williams the sum of $25,000 in compensatory damages as compensation for non-pecuniary damages suffered, such as pain and suffering. USDA also agrees to pay the Williamses $6,250 as additional compensation for any tax consequences they may incur as a result of the recovery under this Agreement. The payments referenced in this paragraph shall be made to Robert and LaVerne Williams as soon as possible but no later than 30 calendar days after this agreement has been signed by all parties.

3. To pay reasonable, documented attorney's fees and costs within 30 days of receipt of a bill of particulars itemizing the legal services rendered and expenses incurred. Such bill of particulars must be submitted to USDA within 30 calendar days after this agreement has been signed by all parties. The failure to submit a timely bill of particulars constitutes a waiver of any right to recover attorney's fees.

**Mr. and Mrs. Williams Agree:**

4. That this settlement agreement constitutes a withdrawal of all of Mr. & Mrs. Williams' administrative discrimination complaints submitted to USDA, and that Mr. and Mrs. Williams will not file any new administrative complaints arising from the events and issues set forth in these complaints.

5. To accept the above relief as a full, final and complete settlement of all claims raised in the Robert and LaVerne Williams' administrative discrimination complaints submitted to USDA, and any and all claims that Robert and LaVerne Williams have against USDA based on facts occurring prior to the date of this agreement of which Mr. and Mrs. Williams knew or reasonably should know.

6. To waive and release any and all claims expressly raised in Mr. and Mrs. Williams' administrative discrimination complaints submitted to USDA, and any and all claims that Mr. and Mrs. Williams have based on facts occurring prior to the date of this agreement of which Mr. and Mrs. Williams knew or reasonably should know, against USDA or any officer, employee, or agent of USDA, in either his or her official or individual capacity, including any claim for attorney's fees and costs.

**Both Parties Agree:**

7. That the explicit terms of this agreement are confidential. The fact that the matter was voluntarily resolved in a manner acceptable to both sides may be communicated by either party to any person. However, except as otherwise required by law, the explicit terms of this agreement will not be disclosed by either party, without the express permission and written consent of the other party, to any person not a party except as necessary for that party to perform official government duties, to implement the agreement, or to defend themselves against any claim or cause of action.

8. That this agreement is governed by the laws of the United States and any action to enforce this agreement will be governed by the laws of the United States.

9. That this agreement constitutes the exclusive terms and conditions of the settlement of this matter. Except for the explicit terms set forth in this agreement, no other relief is intended or implied.

10. That this matter is resolved through this settlement agreement. If the terms of this agreement are not carried out (other than as a result of actions by Mr. and Mrs. Williams), Robert and La Verne Williams may request specific enforcement of the terms of the agreement by writing to the Director, Office of Civil Rights, USDA, Room 326-W, Washington, D.C. 20250. This request should be filed as soon as practicable but no later than 60 calendar days from the date Mr. and Mrs. Williams knew or reasonably should have known, of the alleged failure to implement the agreement. After a written request to the Director, Office of Civil Rights, asking that the terms of the settlement agreement be specifically enforced, USDA will specifically enforce such terms within 60 calendar days if non-compliance with the agreement is found. If specific enforcement does not occur within the 60 days, the claimant may take other action allowable under law.

Hunt Shipman
Deputy Undersecretary for Farm
And Foreign Agricultural Services

Date: 8/2/02

Robert Williams
Complainant

Date: ____________

La Verne Williams
Complainant

Date: ____________

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ROBERT WILLIAMS, an Individual, and<br>LAVERNE WILLIAMS, an Individual;<br><br>Plaintiffs<br><br>ANN VENEMAN, SECRETARY,<br>DEPARTMENT OF AGRICULTURE<br><br>UNITED STATES OF AMERICA,<br>FREDERICK ISLER and<br>CLYDE THOMPSON, Individually<br>and in their governmental capacities<br><br>Defendants | ) | Civil Action No. 03-2245 (CKK)<br><br>Equal Protection and Due Process<br>Fifth Amendment<br>15 U.S.C. § 1691e, ECOA |

**PLAINTIFFS' FIRST AMENDED COMPLAINT**

Plaintiffs ROBERT WILLIAMS and LAVERNE WILLIAMS, Individually, complain of Defendant ANN VENEMAN, Secretary of the Department of Agriculture, in her official capacity and Defendants FREDERICK ISLER and CLYDE THOMPSON, Individually and in their official capacities. and allege as follows:

## I.
## JURISDICTION AND VENUE

1. Jurisdiction and venue lies in this judicial district, pursuant to 28 U.S.C. § 1391(e), because Defendants Ann Veneman, Frederick Isler and Clyde Thompson are located in and the actions complained of occurred in the judicial district of the District of Columbia.

## II. PARTIES

2. Plaintiffs Robert Williams and LaVerne Williams are residents of Roscoe, Nolan County, Texas.

3. Defendant Ann Veneman is the United States Secretary of Agriculture ("USDA"). Secretary Veneman has appeared and is before the Court. Defendant Clyde Thompson is the Deputy Assistant Secretary for Civil Rights. Defendant Clyde Thompson has appeared and is before the Court. Defendant Frederick Isler is the USDA Deputy Director of the Office of Civil Rights. Defendant Frederick Isler has appeared and is before the Court.

## III. FACTUAL BACKGROUND

### A. THE USDA FARM SERVICE PROGRAM AND THE OFFICE OF CIVIL RIGHTS

4. The United States Department of Agriculture ("USDA") was founded in 1862 by President Abraham Lincoln. According to President Lincoln, it was the "people's department." Since its founding, the functions of the USDA have increased. One of its governmental functions at present is to provide assistance to America's farmers and ranchers. The USDA created the FmHA, a credit agency that was authorized to make various types of loans to farmers who are unable to obtain credit from commercial sources. *Hicks v. United States,* 23 Cl. Ct. 647,650 (1991). *See also* Consolidated Farm and Rural Development Act, 7 U.S.C.§ 1922, 1941.

5. These functions are now performed by the FSA, the successor agency to the FmHA. The FSA makes direct and guaranteed farm ownership and operating loans to family-size farmers and ranchers who cannot obtain commercial credit from a bank, Farm Credit System institution, or

other lender. FSA loans can be used to purchase land, livestock, equipment, feed, seed, and supplies. FSA loans can also be used to construct buildings or make farm improvements.

6. The terms and conditions of such loans vary with the particular circumstances of the borrower. The loans are made upon the borrower's full personal liability and are typically secured by chattels, crops, and/or real estate. *See generally* 7 C.F.R. 1941, *et seq*. By law, all such loans are extended to first time and socially disadvantaged farmers, including black farmers such as Plaintiffs.

**B. USDA NONDISCRIMINATION REGULATIONS**

7. In 1966, the USDA promulgated internal management guidelines proscribing discrimination based on race, color, religion, sex, age, handicap, or national original in the administration of any of its direct programs and activities. These internal guidelines are currently codified in 7 CFR §§ 15.3, 15d.2. The guidelines include a voluntary administrative mechanism by which USDA receives complaints of discrimination involving any USDA program, including the Farm Credit and ASCS subsidy programs at issue in this case. *See* 7 CFR §§ 15.6, 15d.4.

8. The Office of Civil Rights ("OCR"), an agency created by federal law under the operation and control of the USDA, is the government agency that is charged with the responsibility of accepting, investigating, issuing final agency decisions and resolving complaints of discrimination pursuant to Title VI, the Equal Credit and Opportunity Act ("ECOA") and the Code of Federal Regulations. Pursuant to the ECOA, the USDA can be held liable for acts of discrimination in the conduct of FSA's federally assisted programs. 15 USC § 1691e *et seq*. *See also* 42 U.S.C. 2000d; Dellinger Report. Moreover, the USDA can be ordered to pay compensatory damages as well as attorneys fees and costs to a person who has been found to have been discriminated against in a USDA program. 15 USC § 1691e. The court is also empowered to "grant such equitable and

declaratory relief as is necessary to enforce the requirements of the ECOA." 15 USC § 1691e(c).

9. Under § 15.6, a person who believes he/she has been the victim of discrimination in programs conducted directly by USDA may file a complaint with the Secretary or any agency within 180 days from the date of the alleged discrimination. 7 CFR § 15.6. Upon receipt, the complaint "shall be promptly referred to the Assistant Secretary for Civil Rights." *Id.* Under the guidelines, OCR is then supposed to investigate the complaint and determine the appropriate corrective actions, if any, required to resolve it. The regulations do not set a deadline by which OCR must act on a complaint nor do the regulations establish requirements regarding the conduct or review of investigations. The filing of an administrative complaint under §15.6 is not a prerequisite to filing suit against USDA under ECOA or any other statute. Instead, §15.6 was designed to enable USDA to police itself internally and correct any discriminatory conduct that might arise in programs USDA administers directly. *See* 54 Fed. Reg. 31,163, 31,163-164(July 27, 1989) (citing 5 U.S.C. §301) *See also* 7 U.S.C. §15.6.

10. Rather than operating as intended to protect persons such as Plaintiffs, the USDA's Office of General Counsel ("OGC") and OCR, the supposed civil rights enforcement arm for the USDA and Defendant Veneman, have in the past and continue to deny black and minority farmers, including Plaintiffs, their rights under the law.

## C. <u>PLAINTIFFS' HISTORY WITH THE USDA</u>

11. Plaintiffs Robert and LaVerne Williams operate a small farm in Roscoe, Texas. Due to their race, Plaintiffs have experienced thirteen years of continually racial discrimination, racial animus, hatred, reprisal and retaliations from Defendant Secretary Veneman and the other

Defendants, as well as FSA officials in Washington, D.C. and Nolan County Texas; OCR officials in Washington, D.C. and the State of Texas; and OGC staff attorneys.

12. In 1995, Plaintiffs were the very first black farmers to file suit against the Secretary of Agriculture invoking Title VI and ECOA because of insidious, intentional discrimination when Plaintiffs attempted to avail themselves of the FSA's federally assisted programs.

13. In conjunction with their 1995 lawsuit, Plaintiffs requested that Agriculture Secretary Mike Espy seek a legal opinion from the Office of General Counsel, Department of Justice ("DOJ") on the applicability of the ECOA and the damages it provided to the USDA. The legal opinion issued by DOJ General Counsel Walter Dellinger contradicted Defendant Veneman's position regarding sovereign immunity. The legal opinion specifically stated that Congress, through enactment of the ECOA, waived sovereign immunity and that, as a consequence, the USDA was liable for the payment of compensatory damages and other relief, including attorneys fees, if found to have violated the ECOA. After issuance of the legal opinion, Plaintiffs' 1995 lawsuit, along with companion lawsuits, *Powell v. Glickman*, *Bowie v. Glickman* and *Long v. Glickman,* were successfully settled giving impetus to black and other minority farmers all over the country to join the *Pigford v. Veneman*, *Brewington v. Veneman,* and *Keepsegal v. Veneman* class action lawsuits.

14. Despite the settlement of their 1995 lawsuit, Plaintiffs continue to be victimized by Defendant Veneman. Since 1999, Plaintiffs have filed two more complaints of discrimination against Defendant Veneman as well as an administrative complaint. The 1999 matter was investigated by the OCR and negotiations with the Williams, represented by counsel James W.

Myart, Jr., began in Washington in July 2002. Plaintiffs returned to Texas when no settlement was reached.

15. Prior to such negotiations, on or about January 15, 2002, Plaintiffs made application to the FSA for a farm and home loan to operate their 1000 acre farm. The application was completed by Plaintiffs with the assistance of Don Craduck, the local FSA official in Fisher County, Texas. On or about February 8, 2002, Plaintiffs were informed by Craduck that their application was complete and that all procedures for loan approval were complete.

16. On or about February 22, 2002, Plaintiffs contacted Sam Snyder, a FSA Loan Official in Washington, D.C., regarding the status of their loan application The following week, Snyder advised Plaintiff LaVerne Williams that there had been some hold-ups because of complaints from local white farmers. Plaintiffs were justifiably alarmed given that local white farmers had harassed Plaintiffs for the past 13 years in concert with local FSA officials.

17. On information and belief, Craduck discussed Plaintiffs' farm and home loan application with other parties including local white farmers. As a result of such discussion, the news of Plaintiffs' loan application was brought to the attention of Plaintiffs' creditors causing the creditors to immediately file liens against Plaintiffs' property in an effort to thwart Plaintiffs' loan application. Plaintiffs were also advised by Craduck that that the outcome of their application was delayed as he needed additional information.

18. On or about March 15, 2002, Plaintiffs discovered that Craduck had investigated the existence of liens on Plaintiffs' property on three different occasions. Upon information and belief,

Craduck was delaying the application while he unlawfully recruited opposition to the Williams loan among local white farmers and other FSA officials.

19. On or about April 10, 2002, Plaintiffs contacted Carolyn Cooksie, the Assistant Administrator of the FSA. Plaintiffs advised Ms. Cooksie that they had concerns regarding the handling of their loan application by the local FSA office. Ms. Cooksie advised Plaintiffs to move on and just pay off any liens so there would be no problem receiving loan funds. Taking Ms. Cooksie at her word, Plaintiffs paid off the liens. After Plaintiffs advised Craduck that their liens had been paid off, he told them they needed to show $3,000.00 in their bank account in order for the farm operation to show cash flow. At that point out of sheer frustration, Plaintiffs gave up. Every time they complied with FSA instructions, additional obstacles were placed in the way that prevented the processing of their loan application. Defendants' actions in delaying Plaintiffs' 2002 application violated the provisions of the ECOA given that Plaintiffs were qualified for a farm loan, had applied for a farm loan, and were denied a farm loan without any reasonable justification and on the basis of their race.

20. On or about May 9, 2002, Plaintiffs filed a discrimination complaint with OCR. The OCR contacted Plaintiffs in response and commenced an investigation. Jerome Williams, an OCR investigation, traveled to Roscoe, Texas to investigate Plaintiffs' complaint. Upon his return to Washington, Mr. Williams, on information and belief, informed Defendants that Plaintiffs had been discriminated against with regard to their 2002 application.

21. On or about July 6, 2002, Plaintiffs and at least 40 other black farmers traveled to

Washington, D. C. at the invitation of Defendant Veneman to meet with her to discuss resolution of their discrimination complaints. Previous to such invitation being extended, several hundred black farmers had staged a sit-in and takeover of a USDA office in Tennessee. During such visit to D.C., Defendants settled an administrative case filed by Richard Grant, a black farmer, for substantial compensatory damages, but later intimated that the case should not have been settled. On information and belief, Defendant Veneman later admitted that the Richard Grand settlement was reached to appease the protesting black farmers.

22. While in D.C. in July 2002, Plaintiffs spoke directly with Defendants Veneman, Thompson and Isler regarding their case and were assured that their case would be settled. After the meeting in D.C., Defendants Isler and Thompson expressed an interest in traveling to Texas to interview Plaintiffs and obtain more information regarding their 2002 complaint. In good faith, Plaintiffs' attorney gave Defendants permission to meet with Plaintiffs outside his presence to gather more information regarding their complaint. Defendants Isler and Thompson traveled to Texas and met with Plaintiffs in the presence of their adult daughter, Gwen Williams. The meeting was by no means an interview. Instead, Defendants took advantage of the opportunity to talk to Plaintiffs outside of the presence of their attorney to try to pressure them into settlement of their claims.

23. During the meeting in Texas, Defendants coerced Plaintiffs to terminate Attorney Myart because their case would not settle at all if Myart continued to represent them. At the prompting and instigation of Defendants Isler and Thompson, Plaintiffs sent a termination letter to Attorney Myart so that they could settle their claims against Defendants. Defendants Isler and

Thompson than pressured Plaintiffs into agreeing to the 2002 Resolution Agreement. *See* Exhibit A, 2002 Resolution Agreement between Plaintiffs and the USDA attached hereto and incorporated herein. The 2002 Resolution Agreement provided for compensatory damages totaling $25,000. *Id.* It did not, however, reflect that Defendants Isler and Thompson told Plaintiffs that the $25,000.00 was for payment of Plaintiffs' tractor and not for compensatory damages. *Id.* The 2002 Resolution Agreement was valued far less than the value of Plaintiffs' claim, did not make Plaintiffs' whole under the law and, in fact, left them in a worse financial and emotionally debilitating position then they were in prior to the 2002 Resolution Agreement. Defendants' acts in obtaining the 2002 Resolution Agreement were clearly discriminatory and demonstrate a continued pattern of discrimination by Defendants when reviewing the history of their dealings with Plaintiffs.

24. Additionally, Defendants ignored a prior resolution agreement. The 1997 Resolution Agreement between Plaintiffs and the USDA provided that "any loan application for a farm operating loan submitted by Mr. and Mrs. Williams within 6 years after this settlement agreement has been signed by all parties will be viewed in a light most favorable to Mr. and Mrs. Williams." *See* Exhibit B, 1997 Resolution Agreement between Plaintiffs and the USDA attached hereto and incorporated herein. Defendants did not abide by the provisions or the intent of the 1997 Resolution Agreement when Plaintiffs' 1999 loan application was mishandled or when Plaintiffs' 2003 loan application was denied.

25. Moreover, Defendants' actions, including those committed by the local FSA county officials, with regard to Plaintiffs' loan applications since execution of the 1997 Resolution

Agreement cannot in any way be construed as being viewed most favorably. In considering Plaintiffs' 2002 application, Defendants conducted numerous property lien searches to find some basis for stalling or denying Plaintiffs' application when only search was required by USDA guidelines. In fact, when considering the applications from white farmers, only one search is conducted.

26. The national office of the FSA violated its legal responsibilities and duties because its Office of Civil Rights was supposed to "monitor all assistance provided..." as outlined in the 1997 Resolution Agreement. *See* Exhibit B. Additionally, the 1997 Resolution Agreement provided that the FSA would ensure that Plaintiffs will not have to deal with the current Agriculture Credit Manager in the Nolan County office. *Id.* Plaintiffs, however, were not told that in order to avoid dealing with the Credit Manager in the Nolan County office, they would be required to travel outside of Nolan County to receive FSA services, unlike white farmers in the same locale.

27. After lodging formal complaints regarding the 2002 Resolution Agreement and the manner in which it was obtained, Defendant Veneman represented to Plaintiffs that a thorough investigation would be conducted of the claims of misrepresentation, coercion, collusion, interference with contract and fraud. She also assured Plaintiffs that if their claims were affirmed, immediate relief would be provided. In spite of clear evidence of official misconduct in procurement of the 2002 Resolution Agreement, Defendant Veneman has not conducted the promised investigations, nor has she provided any form of relief. In fact, Defendant Veneman has never responded to Plaintiffs' formal complaints.

28. Plaintiffs applied to the FSA for a farm operation loan in 2003. After completing the application, Plaintiffs submitted it to Roger Colina, the loan officer for Fisher County, Texas. Some time thereafter, Plaintiffs inquired as to the status of their loan application. Mr. Colina advised them that they had to apply to two private sources for loans and upon denial by the private sources, reapply to the FSA. Plaintiffs reapplied and provided proof of denials from two private sources. Thereafter, Mr. Colina advised that that their application had been denied as it was fraudulent because Plaintiffs had failed to list their tractor as an asset. Rather than being permitted to amend this error, Plaintiffs' loan application was denied.

29. On or about June 15, 2003, Plaintiffs filed an administrative complaint which is now pending in OCR. Plaintiffs' 2003 complaint related to the handling of their 2003 farm operation loan application. Plaintiffs' 2003 complaint, currently in the possession of the USDA, details their allegations regarding the handling of their 2003 loan application. Plaintiffs allege that Defendants denied their application for farm operation loans on the basis of their race, a violation of the ECOA. Plaintiffs have received little to no communications regarding their 2003 complaint from Defendants.

## C. Plaintiffs' Injuries and Damages

30. Plaintiffs suffered and continue to suffer injuries and damages as a result of Defendants' illegal actions, including, but not limited to, injury to their business relations, their credit reputation as well as their standing in the local farm community. Due to the stress related to

Defendants' repeated acts of discrimination, Plaintiff LaVerne Williams has suffered several heart attacks and, on one occasion, had to be airlifted to a hospital in Lubbock, Texas. Moreover, Plaintiffs Robert and Laverne Williams have been under psychiatric care for depression, anxiety and marital dysfunction. Plaintiffs have suffered almost incalculable pecuniary and non-pecuniary damages, and will in all probability, continue to suffer damages in the future unless and until this Court intercedes.

31. Plaintiffs are entitled to recover their reasonable attorneys' fees, including paralegals' fees, and expenses associated with the litigation of their claims. Plaintiffs are entitled to recover a sum from Defendants to compensate Plaintiffs for a reasonable fee for their attorneys' fees, including paralegals' fees, in the preparation and prosecution of this action as well as a reasonable fee for any and all appeals to other courts.

## IV.
## CAUSES OF ACTION

### A. VIOLATIONS OF THE FIFTH AMENDMENT

32. As and for their first cause of action against Defendants, Plaintiffs restate and reallege paragraphs 1-31, above, as if fully stated herein and would further show the Court as follows:

33. Defendants have willfully and intentionally violated and continue to violate the rights of Plaintiffs by depriving Plaintiffs, on the basis of their race, of life, liberty, property and the pursuit of happiness without due process of law and denying Plaintiffs the equal protection of the laws of the United States of America as guaranteed by the Fifth Amendment.

34. Plaintiffs have suffered and continue to suffer from Defendants' intentional

deprivation of life, liberty and property without due process of law and the equal protection of the law. Plaintiffs request injunctive relief from the Court to prevent further violations by Defendants of their Fifth Amendment rights. Plaintiffs seek to enjoin Defendants, during the pendency of this action, from denying any loan applications submitted by Plaintiffs to the FSA. If the Court does not grant the requested injunctive relief, Defendants will continue their discriminatory activities against Plaintiffs. If Plaintiffs' 2003 loan applications are denied, Plaintiffs will suffer irreparable injury because they will be without the necessary funding to continue their farming activities and would be in danger of losing their farm and livelihood. Defendants will not suffer undue hardship or loss because of the issuance of this injunctive relief, and such relief will prevent irreparable injury to Plaintiffs.

35. Plaintiffs request that the Court set their request for preliminary injunction for hearing at the earliest possible time.

**B. <u>VIOLATIONS OF THE EQUAL CREDIT AND OPPORTUNITY ACT</u>**

36. As and for their second cause of action against Defendants, Plaintiffs restate and reallege paragraphs 1-35, above, as if fully stated herein and would further show the Court as follows:

37. Plaintiffs are members of a protected class as defined in the Civil Rights Act of 1964 and the Equal Credit Opportunity Act of 1972.

38. Plaintiffs have:

a. shown themselves eligible for participation in USDA federal programs including Farm Ownership loans, Farm Operating Loans, Equipment Loans and Emergency loans, etc;

b. have availed themselves of the USDA loan programs as socially disadvantaged persons; and

c. have applied for each and every loan and grant available under the federal programs; and

d. have been denied participation in such programs even though white persons have been allowed to participate in said programs and receive such loans and grants.

39. Defendants' violations of the ECOA include, but are not limited to, the following:

a. Their handling of Plaintiffs' 2003 loan application;

b. Their denial of Plaintiffs' 2003 loan application;

c. The manner in which they obtained Plaintiffs' consent to the 2002 Settlement Agreement; and

c. The manner in which they convinced Plaintiffs to terminate their legal representation in order to coerce Plaintiffs into agreeing to the 2002 Settlement Agreement.

40. The ECOA prohibits racial discrimination in any aspect of a credit transaction. *See* 15. USCA § 1691(a)(1). The handling of 2002 Resolution Agreement directly related to Plaintiffs' repeated attempted credit transactions with the FSA, and can be considered a credit transaction in itself given that it addressed loans currently outstanding. Defendants should not be permitted to avoid Plaintiffs' claims for discrimination and violations of the ECOA relating to the 2002 Resolution Agreement given that Defendants drafted the contract, Defendants deliberately misled Plaintiffs when obtaining their agreement to it and Defendants induced Plaintiffs to agree to it without advice of counsel. Plaintiffs' claims relating to the 2002 Resolution Agreement are factually interdependent with their claims arising upon the date that Agreement was made and subsequently. Obviously, a material issue exists as to whether Plaintiffs intended to release claims

against Defendants for Defendants' acts of discrimination in procuring the 2002 Resolution Agreement.

41. The violations of the ECOA had a detrimental effect on Plaintiffs' ability to earn a living and pursue the right to life, liberty and happiness as is afforded white citizens. Plaintiffs have suffered and continue to suffer irreparable injury and monetary damages as a result of Defendants' violations of the ECOA, as described in paragraphs 30 and 31 above. Plaintiffs request the Court grant them compensatory damages as well as their reasonable attorneys fees and expenses incurred in conjunction with their claims against Defendant as permitted under 15 USCA § 1691e. Plaintiffs also request the following equitable and declaratory relief from the Court:

a. Enjoin Defendants from continuing unlawful discriminatory practices against Plaintiffs including, but not limited to, those detailed herein;

b. Appoint a Court-Appointed Administrator to conduct the affairs of the OCR; and

c. Enjoin the OGC of the USDA from continuing to violate federal law by its illegal intrusion into the province of the OCR.

## V.
## REQUEST FOR A TRIAL BY JURY

42. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs request a trial by jury in this action.

## PRAYER

WHEREFORE, Plaintiffs Robert Williams and LaVerne Williams request that Defendants be required to appear and answer herein, and that the Court:

A. Set Plaintiff's Application for Temporary Injunction against Defendants for hearing;

B. Issue a temporary injunction, after notice to Defendants and an evidentiary hearing, enjoining:

(1) Defendants from denying any loan applications submitted by Plaintiffs to the FSA;

(2) Defendants from continuing unlawful discriminatory practices including, but not limited to, appointing a court appointed administrator to conduct the affairs of the USDA Office of Civil Rights; and

(3) the USDA Office of General Counsel from violating federal law in its illegal intrusion into the province of Office of Civil Rights.

C. Issue a declaration that the USDA has violated the provisions of the ECOA as well as Plaintiffs' Fifth Amendment rights continually in its dealings with Plaintiffs;

D. Grant Plaintiffs Robert Williams and LaVerne Williams judgment against Defendants for:

(1) Compensatory damages;

(2) Reasonable attorney's fees and expenses;

(3) Costs of suit; and

(4) such other and further relief as appears just and equitable.

Respectfully submitted,

James W. Myart, Jr. P.C.
306 Preston Avenue
San Antonio, Texas 78210
Phone: (210) 533-9461
Fax: (210) 533-4815

By:____________________________
James W. Myart, Jr.

Federal Bar No.TX0021
myart@sbcglobal.net

ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document has been served under Rule 5 of the Federal Rules of Civil Procedure this ______ day of April, 2004 to the following:

Michael Sitcov
Joshua Z. Rabinovitz
United States Department of Justice
Civil Division, Room 7340
20 Massachusetts Avenue, NW
Washington, D.C. 20530

______________________________
James W. Myart, Jr.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| WILLIAMS, et al., Plaintiffs. v. JOHANNS, et al., Defendants. | § § § § § § § § § § | Civ. No. 03-2245 (CKK) (JMF) |

AFFIDAVIT OF ROBERT WILLIAMS
IN SUPPORT OF OBJECTIONS TO
MAGESTRATE RECOMMENDATIONS AND ORDERS
AND MOTION TO RECUSE

Before me was ROBERT WILLIAMS who was deposed and said the following:

"My name is ROBERT WILLIAMS. I am over 18 years old and I am capable of making this affidavit. I have personal knowledge of the facts stated herein and they are stated to the best of my recollection and ability. I make this affidavit under the penalty and understanding of perjury.

I can not read or write. I can sign my name and I have signed my name to this affidavit in front of a notary public.

This affidavit has been read to me by my wife, Laverne Williams. The words in this affidavit I agree with and I attest to as true and correct.

My wife has read me the words in her affidavit which Mr. Myart has assured me will be filed with the Court. I expressly adopt her words and her affidavit and the facts in it are incorporated herein as if they are fully stated here. I have personal knowledge of the facts stated in my wife's affidavit.

I further state that all I want is my day in court in Washington DC. But I want it to be a fair trial. I want a trial date. I want to be able to present witnesses and I want Judge Kollar-Kotelly to hear everything in trial that the USDA, its officials, including Mr. Clyde Thompson and Mr. Frederick Isler have done to me, my wife and my family.

I want Judge Kollar-Kotelly to hear all the truth about the awful discrimination the USDA has done to me, my wife and my family and how they have caused us illness, stress, depression and millions of dollars in damages. I want Judge Kollar-Kotelly to know how the government has lied to us year after year. I want Judge Kollar-Kotelly to know that they are still discriminating against me and other black farmers across the country.

I have known Mr. Myart since 1992. He has stuck with me and my wife every step of the way, through her illnesses and through our farm problems with the USDA. He has never deserted us and we will not desert him.

I believe that the justice department lawyers and Judge Facciola are biased against us and Mr. Myart. It is not fair. He should be removed and we should be allowed to present a full case to Judge Kollar-Kotelly.

AFFIANT SAYETH FURTHER NOT.

Robert Williams

SUBSCRIBED AND SWORN before me on this 13th day of November, 2007.

Notary Public

LISA ADAMES
Notary Public, State of Texas
My Commission Expires
JULY 26, 2010